**BLANK ROME LLP**
*Attorneys for Plaintiff*
Jeffrey Moller
Alexandra Clark
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERMOOR, INC.<br><br>               Plaintiff,<br><br>     -against-<br><br>U.S. WIND, INC.<br><br>               Defendant. | ECF Case<br><br>20. Civ.<br><br>**VERIFIED COMPLAINT** |

Plaintiff, InterMoor, Inc. ("Plaintiff" or "InterMoor"), by its attorneys as for its Verified Complaint against the Defendant, U.S. Wind, Inc. ("US Wind" or "Defendant"), alleges upon information and belief as follows:

**Jurisdiction and Nature of Case**

1.      This is a cause within the admiralty and maritime jurisdiction of this Court, pursuant to 28 U.S.C. §1333, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. InterMoor's claims against U.S. Wind are the subject of ongoing litigation in the United States District Court for the Eastern District of North Carolina (the "North Carolina Action") and the United States District Court for the District of Maryland, Baltimore Division (the "Maryland Action").

2.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1333 because this action arises from a maritime contract, *i.e.* a master services agreement pertaining to the transportation and installation of a meteorological mast tower at an offshore wind farm project on the Outer Continental Shelf.

3.      Plaintiff brings this action to obtain security for a maritime claim pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims in order to obtain security and jurisdiction. The writ is to be directed at US Wind's tangible or intangible property located in this district, including a bank account owned by US Wind. No waiver is intended of the rights of InterMoor to commence and/or continue the proceedings in the North Carolina Action or the Maryland Action.

### The Parties

4.      Plaintiff is a corporation organized under the laws of the State of Delaware with its principal place of business in Houston, Texas.

5.      Defendant is a corporation organized under the laws of the State of Massachusetts with its principal place of business in Baltimore, Maryland.

### Factual Background

6.      US Wind is owned by Renexia S.p.A., an Italian company and a subsidiary of Toto Holding Group. In 2014, US Wind was awarded two leases offshore of Ocean City, Maryland to build an offshore wind farm with a total investment of $2.5 billion (the "Project").

7.      As part of the Project, US Wind signed an agreement with EPIC Applied Technologies ("EPIC") in or around May of 2019 for the installation of a meteorological tower (the "MET Mast Tower") to be used to collect raw wind data. Installation of the MET Mast Tower was scheduled to begin on July 14, 2019, with installation anticipated to be completed by August 8, 2019.[1] EPIC was the prime contractor for the MET Mast Tower portion of the Project and contracted with various subcontractors to provide services, including affiliates of InterMoor.

---

[1]      http://www.uswindinc.com/us-wind-moves-ahead-met-mast-tower-plans/

8.      In July of 2019, US Wind terminated its contract with EPIC due to financial issues of EPIC and the impending bankruptcy filing of EPIC. US Wind then approached InterMoor and requested that it take over EPIC's role as prime contractor, and InterMoor and US Wind entered into a Master Service Agreement dated July 29, 2019 (the "MSA"). US Wind further demanded that certain subcontractors on the MET Mast Tower portion of the Project be retained by InterMoor when InterMoor took over EPIC's role as prime contractor.

9.      One of those subcontractors was All Coast, LLC ("All Coast"), which had agreed to the charter of the *Great White* lift boat for the installation of the Met Mast foundation and Met Mast Tower at the Project. However, due to US Wind's inability meet certain required insurance pre-requisites, it requested that InterMoor enter into a contract directly with All Coast for the charter of the *Great White*, knowing that InterMoor had no previous relationship with All Coast.

10.     Due to poor weather conditions and three named windstorm events, the transit of the *Great White* to the Project location was slowed. InterMoor provided regular email updates to US Wind on the progress of the *Great White* as well as the *force majeure* events that were affecting the progress of the Project. Furthermore, when the *Great White* arrived to the Project site, the vessel's captain determined that the operations required for the Project could not be safely undertaken due to weather conditions. US Wind was regularly updated regarding the Project, including the Captain's determinations.

11.     With the Project already running behind due to EPIC's bankruptcy and the change of prime contractor to InterMoor, US Wind was concerned about further costs and raised questions on September 23, 2019, about the daily standby costs of the *Great White* that it was accruing for the "weather delays."

12.     On September 26, 2019, despite acknowledging significant weather related delays, and ignoring terms of the MSA that suspend obligations of a party to the MSA when a

3

party is prevented from performing said obligations due to a *force majeure* event, US Wind, through its attorney, sent notice advising it was terminating the MSA. Specifically, US Wind advised it was terminating the MSA under Section 4.3 thereof because "US Wind believes that InterMoor has negligently supervised the actions of their subcontractor, All Coast, allowing them to unreasonably refuse to perform necessary operations under the MSA." This correspondence also stated that US Wind will suspend all payments while it assesses the amount of damages it has suffered due to "InterMoor's breach" and further requested that InterMoor not make any further payments to subcontractors.

13.     Section 4.3 of the MSA states:

> 4.3     **Default Termination** – Notwithstanding the foregoing, in the event [US Wind] believes that [InterMoor] has breached any of the material obligations set forth in this Agreement, [US Wind] shall provide [InterMoor] with written notice setting forth the particulars of the alleged breach. In the event that [InterMoor] shall be considered in default, and [US Wind] may terminate this Agreement or any Work Order by giving [InterMoor] ten (10) days' advance written notice of such termination. In the event [US Wind] terminates this Agreement or any Work Order due to [InterMoor's] default, [InterMoor] shall be entitled to payment as set out in Article 6 for the portion of the Work performed in accordance with this Agreement and the applicable Work Order. Any additional costs reasonably incurred by [US Wind] as a direct result of such termination shall be recoverable from [InterMoor], up to a maximum of twenty-five percent (25%) of the amount that [InterMoor] would have been paid if it had completed the Work.

Were US Wind's September 26, 2019 notice of termination effective, which it is not, it would result in the termination of the MSA on October 6, 2019.

14.     Upon information and belief, by terminating for the alleged reasons identified in US Wind's attorney's September 26, 2019 correspondence, US Wind improperly sought to invoke favorable termination terms rather than the terms provided in the other termination clause of the MSA, Section 4.2, which states:

> 4.2     **Optional Termination of Work Order** – [US Wind] may, in its sole discretion, terminate any particular Work Order (as defined in Article 5), at any time, upon giving [InterMoor] five (5) days' advance written notice, unless otherwise specified in the applicable Work Order. In the event of such

termination, [InterMoor] shall be entitled to payment as set out in Article 6 for the portion of the Work performed in accordance with the Agreement and the applicable Work Order, together with the costs to demobilize [InterMoor's] personnel and equipment, and such other reasonable costs as agreed between the Parties at the time of termination.

15.     As of September 26, 2019, four separate unpaid invoices had been issued by InterMoor to US Wind for work performed in connection with the Project, including charter sought by All Coast, with the total amount of these invoices equaling $1,820,808.78. Per the terms of the MSA, payment for each of these invoices was due within five (5) days after receipt by US Wind unless US Wind, within the five day period, notified InterMoor of any item in dispute and specified the reason therefor. In the event a portion of the invoice was disputed, timely payment of the undisputed portion of the invoice was still required under the MSA.

16.     For each of these four invoices, US Wind did not notify InterMoor of any item in dispute, including any reason to dispute any item with US Wind's invoices, within the five day period. However, despite the lack of any such notification to InterMoor, US Wind has not paid these invoices and refuses to pay the $1,820,808.78 indisputably owed to InterMoor. InterMoor has issued an additional $5,225,344 in invoices to US Wind that have not been paid (for a total sum of $7,046,152.78), and US Wind has indicated no such payment will be made.

17.     In addition to the above, InterMoor entered into a Time Charter Order with Marmac, LLC d/b/a McDonough Marine Services ("McDonough") for the charter of the *Marmac 261* barge. The barge transited the MET Mast Tower from Louisiana to the Federal Waters Project Site but due to the aforementioned weather conditions and the improper termination of the MSA, the MET Mast Tower was not installed as planned.

18.     After US Wind's counsel improperly terminated the MSA and informed InterMoor that it intended to breach the MSA and not pay InterMoor, and further instructed InterMoor not to pay subcontractors, the *Marmac 261* barge began its transit back to Louisiana with the MET Mast Tower onboard. On or about October 10, 2019, the MET Mast Tower and

the *Marmac 261* barge to which it was secured were arrested in North Carolina as a result of an action brought by US Wind in the United States District Court of the Eastern District of North Carolina, Eastern Division (the "North Carolina Action").

19.    InterMoor intervened in the North Carolina Action and ultimately, on January 29, 2020, the federal court in the North Carolina Action issued an order requiring US Wind to post a bond of $3,500,000. US Wind did so and the MET Mast Tower was released at this time. Despite representing to the court in the North Carolina Action that McDonough was ready to contract directly with US Wind to transport the MET Mast Tower to Maryland and that this was US Wind's preferred course of action, US Wind never contracted directly with McDonough and initially refused to allow the MET Mast Tower to leave North Carolina waters. In doing so, US Wind willfully and intentionally interfered with the Time Charter Order, causing damages to InterMoor.

20.    Since the posting of the $3,500,000 bond, US Wind has been given multiple opportunities to retrieve and recover its MET Mast Tower but has not done so. Instead, US Wind chose to store its Met Mast on the Barge where it remains today at a shipyard in Louisiana. US Wind is not paying for the storage of its Met Mast Tower and has effectively assumed exclusive dominion over the Barge, to the exclusion of InterMoor's use of same and ability to perform certain remaining contractual obligations under the Time Charter Order.

21.    US Wind is also attempting to convert the MSA into an "implied bailment" contract that places unquantifiable and non-monetary responsibilities on InterMoor despite the ability to retrieve its MET Mast Tower and knowledge that InterMoor does not agree to possession of the MET Mast Tower. US Wind's conduct has caused and is causing irreparable harm to InterMoor.

## Causes of Action

### A.    Breach of Contract

22.    Plaintiff repeats and re-alleges each and every allegation contained in all proceedings paragraphs and incorporates those allegations herein.

23.    Per the terms of the MSA and pursuant to instructions received from US Wind, InterMoor performed work for which it expected payment under the MSA. To date, US Wind has breached the MSA for failure to make payment as required by the terms of the MSA, and InterMoor has suffered injuries and damages as a result thereof.

24.    In addition, US Wind has breached the contract by improperly terminating the MSA under Section 4.3. There was no material breach of the MSA by InterMoor and therefore, US Wind breached the contract by terminating under this provision. InterMoor has suffered injuries and damages as a result thereof.

### B.    Quantum Meruit

25.    Plaintiff repeats and re-alleges each and every allegation contained in all proceeding paragraphs and incorporates those allegations herein.

26.    Pleading in the alternative, InterMoor has provided valuable services and materials to US Wind at the Project, who accepted the services and materials under such circumstances as would reasonably notify US Wind that InterMoor expected to be paid for such services and materials.

### C.    Breach of the Implied Duty of Good Faith and Fair Dealing

27.    Plaintiff repeats and re-alleges each and every allegation contained in all proceeding paragraphs and incorporates those allegations herein.

28.    The MSA imposed an obligation of good faith and fair dealing in its performance and enforcement on US Wind.

29.     Under the implied duty of good faith and fair dealing, InterMoor had a legal duty not to do anything to injury or destroy the right of InterMoor to receive the benefits of the MSA.

30.     US Wind's actions as set forth herein have been in bad faith and have evaded the spirit of the MSA. US Wind's actions as set forth herein have been in bad faith and have evaded the spirit of the MSA. As a strategic measure rather than a fair and good faith action, US Wind withheld money owed to InterMoor that was past due because US Wind was aware that weather conditions would further prolong the MET Mast Tower Project, and US Wind did not want to incur those additional costs.

31.     Furthermore, US Wind terminated the MSA in bad faith by citing to Article 4.3 of the MSA as the basis for termination when US Wind knew that it was already in breach of the MSA and that the terms of Article 4.3 did not apply. US Wind cited this provision solely for financial reasons and without regard to the facts.

32.     US Wind's conduct has been willful, indecent, unfair, unreasonable and in bad faith.

33.     US Wind's conduct constitutes a breach of the implied duty of good faith and fair dealing.

34.     As a result of US Wind's willful breach of the implied duty of good faith and fair dealing, InterMoor has been damaged and is entitled to recover its actual damages as a result of this breach and exemplary damages.

**D.      Tortious Interference with Existing Contract**

35.     InterMoor repeats and re-alleges each and every allegation contained in all proceeding paragraphs and incorporates those allegations herein.

36.     While InterMoor terminated the Time Charter Order with McDonough, the obligation to redeliver the Barge to McDonough survives termination. US Wind has and

continues to intentionally and improperly interfere with InterMoor's redelivery obligation under the Time Charter Order by leaving the Met Mast on the Barge and refusing to remove and retrieve its Met Mast. The presence of the Met Mast on the Barge impedes and prevents InterMoor's ability to carry out the redlivery obligation under the Time Charter Order and further causes InterMoor's performance under the Time Charter Order to be more expensive and burdensome. Such interference is causing damages to InterMoor, and InterMoor is entitled to recover its actual damages as a result of this interference and exemplary damages as US Wind acted with malice.

### E.    CONVERSION

37.    InterMoor repeats and re-alleges each and every allegation contained in all proceeding paragraphs and incorporates those allegations herein.

38.    Pursuant to the surviving obligation of redelivery under the Time Charter Order, InterMoor is entitled to possession of the Barge to complete its redelivery obligations. Despite this, U.S. Wind has continuously refused to remove the Met Mast from the Barge, and in doing so, has effectively assumed exclusive dominion over the Barge to the exclusion of InterMoor's ability to redeliver the Barge. Since U.S. Wind has refused InterMoor's demand for removal of the Met Mast despite posting a $3.5 million bond to secure its release, U.S. Wind has caused damages to InterMoor.

39.    In addition, US Wind has acted with malice with respect to its conversion of the Barge, and InterMoor seeks exemplary damages as a result of US Wind's conduct.

### F.    REQUEST FOR DECLARATORY RELIEF

40.     InterMoor repeats and re-alleges each and every allegation contained in all proceeding paragraphs and incorporates those allegations herein.

41.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201, 2202, InterMoor seeks a declaration regarding the alleged bailment relationship that US

Wind contends exists with respect to the MET Mast Tower. Specifically, InterMoor requests the Court enter the following declaration: InterMoor is not a bailee of the MET Mast Tower.

**Attorney's Fees**

42.     As a result of US Wind's actions above, InterMoor has been forced to incur reasonable and necessary attorneys' fees and costs. InterMoor is entitled to recover its reasonable and necessary attorneys' fees and costs of litigation pursuant to Article 11.14 of the MSA.

**Basis for Order of Rule B Attachment**

43.     After a diligent search, and as is further set forth in the accompanying Affidavit of Alexandra Clark, US Wind cannot be found with this District for purposes of Supplemental Rule B.

44.     Diligent searches of the website maintained by the New York Secretary of State, of the internet Whitepages and Yellowpages directory, and a general internet search via Google did not identify US Wind as:

a.     Ever being registered or authorized to transact business in the State of New York;

b.     Being incorporated or registered in the State of New York;

c.     Having appointed an agent for service of process in this District; or

d.     Having any other presence in this District.

45.     Further, Plaintiff is unaware of US Wind having any general or managing agents in this District.

46.     Accordingly, US Wind cannot be "found" within this District for the purpose of an attachment pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims, and Plaintiff seeks an Order of Attachment against such property, tangible or intangible, of Defendant as may be found within the District, up to and include the full amount claimed herein

(and subject to Plaintiff's reservation of all rights to adjust that amount as may become necessary and proper).

47.     Based on information provided by US Wind, it maintains a bank/checking account with UniCredit S.p.A. in New York City. As a result, US Wind, has, or will shortly have, assets within this  District comprising, *inter alia*, cash, funds, credits, debts, bank accounts and/or correspondent accounts of, belonging to, due or for the benefit of US Wind (collectively hereafter "Assets") including but not limited to Assets in its name and/or being held for its benefit, at UniCredit S.p.A., or at such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

48.     Pursuant to its Rule B maritime attachment application, InterMoor seeks to attach the sum of $3,379,296.78 that is due and owing to InterMoor by US Wind under the MSA (US Wind has posted a bond of $3.5 million in the North Carolina Action, hence the reason InterMoor does not seek to attach the full amount of its damages through this application).

349.     Furthermore, pursuant to the MSA, the prevailing party in a dispute raised thereunder is entitled to attorneys' fees. InterMoor estimates that it will incur approximately $500,000 in awardable attorneys' fees for prosecuting its claim against US Wind. Therefore, the total sum sought to be attached pursuant to Rule B is $4,046,152.78.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

(A)     That a summons with process of attachment and garnishment may issue against the Defendant and that if it cannot be found, that its property whether real or personal, tangible or intangible, presently existing or hereinafter arising which could be assigned or transferred including, but not limited to, cash, deposits, instruments, securities, security entitlements,

security accounts, equity interests, credits or debits assigned to or for the benefit of the Defendant with the district may be attached in amount sufficient to answer Plaintiff's claim, and in an amount not less than $4,046,152.78;

(B)    That this Court retain jurisdiction over this matter for any subsequent enforcement action as may be necessary;

(C)    That to ensure the attachment of Assets only to the extent they relate to US Wind, and to foster substantial economies in time and expense, a person over 18 years of age who is not a party to this action be appointed pursuant to Fed.R.Civ.P.4(c) to serve process of maritime attachment and garnishment in this action; and

(D)    That Plaintiff may have such other and further relief as the Court may deem just and proper in law and equity.

Dated:      New York, New York

June 3, 2020

Respectfully submitted,
**BLANK ROME LLP**

By:    */s/ Jeffrey Moller*
Jeffrey Moller (Moller@BlankRome.com)
Alexandra Clark (AClark@BlankRome.com)
1271 Avenue of the Americas
New York, NY 10020
Phone: (212) 885-5000

**HOLMAN FENWICK WILLAN USA LLP**
Glenn Legge (*of counsel*)
(Glenn.Legge@hfw.com)
Cade White (*of counsel*)
(Cade.White@hfw.com)
5151 San Felipe, Suite 400
Houston, TX
Phone: (713) 917-0888

*Attorneys for Plaintiff*

## <u>VERIFICATION OF COMPLAINT</u>

Pursuant to 28 U.S.C. § 1746, Carrie Adams, being duly sworn, deposes and says:

1.      I am employed by InterMoor, Inc., the Plaintiff in the above captioned dispute. My job title is General Manager.

2.      I have read the foregoing Verified Complaint and know the contents thereof.

3.      The facts asserted in the Verified Complaint are true and correct within my personal knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2020.

Signed:_____
Name: Carrie Adams
Title: General Manager